UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JEFFREY D. GIBSON,

    Petitioner,

  -vs-

THOMAS LAVALLEY, Supt. Clinton
Correctional Facility,

    Respondent.

**DECISION AND ORDER**
**No. 12-CV-6031(MAT)**

---

## I. Introduction

Pro se petitioner Jeffrey D. Gibson ("Gibson" or "Petitioner")
has filed a Petition for a Writ of Habeas Corpus pursuant to
28 U.S.C. § 2254. Gibson is incarcerated pursuant to a judgment
entered against him on March 19, 2008, following a jury verdict in
Erie County Court (Michalski, J.) of New York State convicting him
of Robbery in the First Degree (N.Y. Penal Law § 160.15(4)).

## II. Factual Background and Procedural History

Stacey Koehler ("Koehler") was working at the Noco store and
gas station on South Park Street in the City of Lackawanna on
July 10, 2005. At about 5:30 a.m., near the end of her shift,
Koehler wanted to step outside to have a cigarette. She called to
her eleven-year-old daughter, who was helping her by stocking soda
in the back cooler. As Koehler and her daughter approached the
door, a black male walked inside. He pointed a gun, partially
covered by a paper bag, about two inches from Koehler's face.
Koehler noted that the robber's face was covered with something

dark that looked like a bandana, but she could see his eyes. She described him as wearing a "tannish-colored baseball cap" and "tannish, brownish" clothing that were "pretty baggy". T.287.[1] His voice was that of an adult, rather than an adolescent. Koehler, who was 4'1", estimated the robber to be about 5'3- or 5'5"-tall. She explained that he was "taller than [her] and . . . shorter than what [she] would consider the average man." T.318.

The robber announced, "I want the money, bitch" and said she had until the count of ten to give him the money. Koehler, fearing for her and her daughter's life, removed the cash drawer and placed it on the counter. The robber then demanded the money from the safe, and Koehler explained that she did not have the combination. The robber grabbed the money from the drawer and fled.

Kevin Kalinowski ("Kalinowski"), who lived at 97 Victory Avenue, had just gotten home from his job as a musician at about 5:30 a.m. and was sitting on his porch having a cigarette. Hearing footsteps, he looked up and saw someone dressed in "dark" clothing run past his porch very quickly. It appeared to Kalinowski that the person was wearing a "glittery shiny, like gold or silver" type of headgear, like "some kind of helmet . . . or something." T.335. Whatever it was, Kalinowski stated, it was reflected off the streetlight. The man turned left on Leo Street. The police arrived

---

[1]

Numerals preceded by "T." refer to pages from the trial transcript.

soon after and asked if he had seen anybody running or anyone with a gun, and Kalinowski informed them what he had observed.

Police officers Bryan Girdlestone ("Officer Girdlestone") and Joseph Milkowski received a radio call of a robbery in progress at the Noco store at approximately 5:30 a.m., perpetrated by a black male about 5'6"-tall. Upon arrival, Officer Girdlestone learned from another officer the direction the robber had taken, and he and his partner began canvassing the neighborhood on foot.

When Officer Christopher Caber ("Officer Caber") responded to the Noco robbery, he saw a black female (later determined to be Takeisha Matthews ("Matthews"), Petitioner's girlfriend) standing in the middle of the parking lot next to the gas pumps. According to Officer Caber, he thought it was odd she was standing there because no cars were in the parking lot. In addition, the woman "never took her eyes off" him as he walked from his patrol car into the store. T.410. He later saw her walking about a half-mile away down Ridge Road with Petitioner. Both denied being aware of the Noco robbery. She stated that she had walked to the Noco to get something to eat but found that the doors were locked. T.429. Officer Caber recalled that Matthews stated they were on their way to visit someone's grandfather.

In the backyard of 80 Colton Street, a residence approximately two hundred yards from the crime scene, Officer Girdlestone found a sweatshirt and a pair of sweatpants, both turned inside out. He

also found a tan-colored Boston Celtics baseball cap, a black do-rag, and a knit cap in a garbage can in the driveway. T.381-83. All of these articles were documented, collected, and brought to Lieutenant Joseph Leo at the Noco store, who in turn showed them to Koehler. Koehler identified the Celtics baseball hat, the sweatpants, and sweatshirt as having been worn by the robber. See T.296-98. She did not identify the knit hat, however.

All the items were transferred to the Central Police Services laboratory for analysis. Forensic biologist Jodi Luedemann swabbed the seized articles of clothing, and senior forensic serologist Paul Mazur extracted DNA from the swabbing for analysis. The results from the swabs were compared to the butt of a cigarette that Gibson had smoked during a meeting with Detective Daniel Cardi ("Detective Cardi") after he was arrested on an unrelated matter. Forensic comparison demonstrated that Gibson could not be excluded as a contributor to the major portion of the genetic material on the baseball cap and to the minor portion of the genetic material on the sweat pants. The knit hat contained a mixture of DNA from at least two individuals, one being a female. The major portion of the other DNA profile from the knit hat was identical to the DNA profile from the cigarette butt. In other words, the DNA from the cigarette butt matched the DNA of the knit hat found along with the do-rag and baseball hat in the garbage can at 80 Colton Street.

The defense called Peter McQuillor ("McQuillor"), Petitioner's grandfather in an attempt to cast doubt on who might have worn the clothing found at 80 Colton Street and to suggest a reason as to why Petitioner and his girlfriend had been seen walking on Ridge Road on the morning of the robbery. McQuillor testified that his grandson lived with him, along with his other grandchildren, off and on and for various lengths of time. It was common practice for the grandchildren to borrow clothes belonging to each other. T.662-64. McQuillor testified that about five days a week, Petitioner and his girlfriend would make breakfast for him. T.665.

The defense also called Dr. Michael Garrick ("Dr. Garrick"), a professor of biochemistry with expert knowledge in the field of genetics and molecular biology. Dr. Garrick testified that based upon the amounts of genetic material found on the clothing items excluding the knit hat, it was "difficult to associate them" with Petitioner. T.674. He did not question the results of the genetic testing performed on the knit hat. Dr. Garrick also indicated that other members of Petitioner's family could have contributed some DNA to the samples taken from the clothing items, and to exclude those family members would require further information and analysis.

The jury returned a verdict convicting Gibson as charged in the indictment. After a hearing, Gibson was adjudicated as a

persistent felony offender and sentenced to an indeterminate term of 25 years to life.

Petitioner's conviction was affirmed on direct appeal. <u>People v. Gibson</u>, 74 A.D.3d 1700 (4th Dept.), <u>lv. granted</u>, 15 N.Y.3d 780 (2010), <u>aff'd</u>, 17 N.Y.3d 757 (2011). This timely habeas corpus petition followed.

For the reasons discussed below, Gibson's request for a writ of habeas corpus is denied, and the petition is dismissed.

## III. Discussion

### A. Denial of the Right to Counsel During Interview With Detective Cardi

#### 1. Factual Background

Detective Cardi of Lackawanna Police Department was involved in the investigation of the Noco robbery and had transported the recovered articles of clothing evidence to the forensic laboratory for analysis. When he reported to the police station the morning of July 19, 2005, he learned that Petitioner, whom he knew was a suspect in the Noco robbery, had been arrested on a bench warrant in an unrelated matter. Petitioner asked if he could speak with the detective, whom he had known for several years and with whom he had a cordial relationship. Detective Cardi brought Petitioner to his office for the conversation. <u>See</u> T.507-10.

Detective Cardi knew Petitioner was represented in the unrelated criminal matter, and did not intend to question him about the Noco robbery or any other criminal matter. However, he did hope

-6-

to obtain a DNA sample from Petitioner's saliva. To that end, he brought out a pack of cigarettes, knowing that Petitioner was a smoker. Petitioner asked for one, and Cardi obliged. Both men smoked while Petitioner informed Detective Cardi about some problems his girlfriend was having with her landlord. Neither the Noco robbery nor any other charges pending against Petitioner were discussed during the conversation.

Eventually, Petitioner extinguished his cigarette in the ashtray Detective Cardi had placed near him. Guards returned Petitioner to his cell. Detective Cardi surreptitiously placed the ashtray with Petitioner's cigarette butt inside his desk drawer.

### 2. The State Courts' Rulings

As noted above, DNA from Petitioner's saliva was extracted from the cigarette butt and was found to conclusively match the DNA found on the knit hat believed to have been worn by the person who robbed the Noco store. Before trial, Petitioner moved unsuccessfully for suppression of the DNA-bearing cigarette butt. The trial court held that Petitioner did not have standing to protest the seizure of the cigarette but because he had failed to demonstrate a legitimate expectation of privacy in it. The trial court further determined that even if Petitioner had established standing, he had abandoned the cigarette butt, rendering its suppression inappropriate.

On direct appeal, Petitioner challenged the suppression hearing court's ruling on right to counsel grounds, arguing that the detective, knowing that he was represented by counsel on the pending, unrelated charge, had obtained physical evidence from him in an uncounseled interview. A four-justice majority of the Appellate Division rejected that contention, with one justice dissenting.

The majority noted that because formal proceedings had not been commenced against Petitioner with regard to the robbery charge, his right to counsel arose from the unrelated charge, pursuant to the Fifth Amendment and its state counterpart. See People v. Settles, 46 N.Y.2d 154, 161 (1978). Observing that the rights set forth in the Fifth Amendment do not apply to evidence that is not "testimonial or communicative" in nature, see Schmerber v. California, 384 U.S. 757, 761 (1966), the Appellate Division noted an accused is not protected by the Fifth Amendment from being compelled to produce "real or physical evidence". People v. Gibson, 74 A.D.3d at 1702 (quoting Pennsylvania v. Muniz, 496 U.S. 582, (1990) (quoting Schmerber, 384 U.S. at 764) (quotation marks omitted)). Analogizing the DNA from Petitioner's saliva to the blood-alcohol content of a blood sample, the Appellate Division concluded that it "can be viewed only as real or physical evidence because it is not testimonial or communicative" and therefore not protected by the Fifth Amendment. Inasmuch as Petitioner's Fifth

Amendment right against self-incrimination was not violated by Detective Cardi's covert obtaining of his saliva, it "necessarily follow[ed] that his derivative right to counsel under the Fifth Amendment . . . was not violated either." Id. (citing Schmerber v California, 384 U.S. at 764 (1966) ("Since the petitioner was not entitled to assert the privilege [against self-incrimination], he has no greater right because counsel erroneously advised him that he could assert it[.]")) (alterations in Gibson).

One justice dissented, finding that Detective Cardi engaged in conduct that was reasonably likely to elicit an incriminating response, that is, he subjected Gibson to the functional equivalent interrogation. The dissenter noted that under the New York state constitution, a waiver of rights may be obtained from a criminal suspect who is actually represented by counsel, and known by the police to be so represented, only in the presence of counsel. People v. Gibson, 77 A.D.3d at 1702 (citation omitted). Because Gibson had been subjected to interrogation, and because he could not validly waive his rights without his counsel present, the dissenting justice found that the DNA obtained by the detective was accomplished by unconstitutional means. Id.

The New York Court of Appeals unanimously affirmed the conviction, finding that under the circumstances of Petitioner's case, the collection of his "DNA while he was in custody did not contravene his indelible right to counsel." People v. Gibson, 17

N.Y.3d at 35. The Court of Appeals disagreed with the dissenting justice, finding that the detective's actions–displaying a pack of cigarettes and offering one to Petitioner at Petitioner's request–were not reasonably likely to issue an incriminating response and therefore did not amount to a custodial interrogation. The Court of Appeals further found that the DNA deposited by Petitioner on the cigarette butt was not a "response" or "statement" subject to exclusion under New York's right to counsel rules "because the transfer of bodily fluids was not a communicative act that disclosed the 'contents of defendant's mind[.]'" Id. (quotation omitted). Finally, the court found, the detective had not subjected Gibson to the functional equivalent of an uncounseled decision to consent to a search. Id. (citations omitted).

### 3. The State Courts Did Not Unreasonably Apply Clearly Established Supreme Court Law.

The purpose of the Fifth Amendment right "is to protect . . . the suspect's desire to deal with the police only through counsel." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) (internal quotation omitted). The purpose of the Sixth Amendment guarantee of counsel, on the other hand, "is to protec[t] the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." Id. at 177–78 (internal quotation omitted; emphasis and alteration in original). Because

"[t]he scope of an accused's right to counsel under the Fifth Amendment is bounded by the explicit right from which it is derived—namely, the right to be free from compelled self-incrimination," this right "arises only in situations where the right to be free from compelled self-incrimination might be threatened, as, for example, where an individual is subjected to custodial interrogation by the police." <u>United States v. Melgar</u>, 139 F.3d 1005, 1010 (4th Cir. 1998), <u>abrogated on other grounds by Texas v. Cobb</u>, 532 U.S. 162 (2001) (quotation omitted).

The state courts did not unreasonably interpret or apply <u>Schmerber v. California</u>, in which the Supreme Court "upheld a state-compelled blood test against a claim that it infringed the Fifth Amendment right against self-incrimination, made applicable to the States through the Fourteenth Amendment." <u>South Dakota v. Neville</u>, 459 U.S. 553, 559 (1983) (explaining <u>Schmerber</u>'s scope). The Supreme Court expressly held in <u>Schmerber</u> that the blood sample taken for alcohol testing was not within the Fifth Amendment privilege since "testimonial capacities were in no way implicated." <u>Schmerber</u>, 384 U.S. at 765. As the <u>Neville</u> court later noted, the Fifth Amendment privilege has "never been given the full scope suggested by the values it helps to protect[,]" and therefore "the privilege bars the State only from compelling 'communications' or 'testimony.'" 459 U.S. at 559. Because the blood test at issue in <u>Schmerber</u> was "physical or real" evidence rather than "testimonial"

evidence, the Supreme Court found that it was not protected by the Fifth Amendment privilege against self-incrimination. Id. This conclusion, the Schmerber court stated, also answered the petitioner's claim that, in compelling him to submit to the test despite the fact his objection thereto was made on the advice of counsel, he was denied his Sixth Amendment right to the assistance of counsel. 384 U.S. at 766. The Supreme Court explained that "[s]ince petitioner was not entitled to assert the [Fifth Amendment] privilege, he has no greater right [under the Sixth Amendment] because counsel erroneously advised him that he could assert it." Id.; see also Neville, 459 U.S. at 559 n. 8. Schmerber thus precludes Gibson from succeeding on a right-to-counsel claim under the Sixth Amendment of the federal constitution.

With regard to his claim of right to counsel under the Fifth Amendment, the assertion of such a right depends upon the existence of a custodial interrogation. See United States v. Melgar, 139 F.3d at 1010 ("Outside the context of a custodial interrogation, the Fifth Amendment does not afford a suspect the right to counsel.") (citation omitted). In Arizona v. Mauro, 481 U.S. 520 (1987), the Supreme Court held that permitting a person in custody to enter into a situation in which law enforcement officers are aware there is a possibility that the suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation. Id. at 528-30 (holding that accused, who had

asserted right to counsel, was not subjected to interrogation or its functional equivalent when police allowed defendant's wife to speak with him in presence of officer and tape recorded their conversation, even though officers were aware of possibility that defendant would incriminate himself while talking to wife; officer present asked defendant no questions about the crime or his conduct, and there was no showing that officers sent wife in to see defendant for purpose of eliciting incriminating statements). The Mauro court noted that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." Id. at 529. In holding that Detective Cardi did not subject Gibson to custodial interrogation or its functional equivalent, the New York Court of Appeals thus did not unreasonably apply clearly established Supreme Court law. Without a custodial interrogation, Gibson has no federal Fifth Amendment right to counsel to assert.

Finally, Gibson's claim on appeal was grounded primarily, if not entirely, in the Fifth Amendment to the New York state constitution, which provides a right to counsel that the New York Court of Appeals "has consistently interpreted . . . more broadly than the Supreme Court has interpreted the federal right to counsel." Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992) (citing People v. Settles, 46 N.Y.2d 154, 1616 (1978)). On a petition for federal habeas relief, a district court is "limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States." <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991); <u>see also</u> 28 U.S.C. § 2254(a). Even if Gibson had demonstrated a violation of his state-law right to counsel, it would not be a sufficient basis on which to predicate habeas relief. <u>E.g.</u>, <u>Tineo v. Heath</u>, No. CV-09-3357 SJF, 2012 WL 4328361, at *13 n.5 (E.D.N.Y. Sept. 19, 2012) ("Petitioner's claim that his mother had actually entered the matter about which he was being questioned as his attorney when she called the precinct looking for him arises under New York state law, which is broader than federal constitutional requirements, <u>see Claudio v. Scully</u>, 982 F.2d [at] 803 . . . , and is not cognizable on federal habeas review."); <u>Kotler v. Woods</u>, 620 F. Supp.2d 366, 383 (E.D.N.Y. 2009) ("[W]hile a more expansive right to be present may apply under New York law, that broader right is not applicable in a federal habeas proceeding where it does not implicate the rights of the defendant under the United States Constitution.") (citation omitted).

## B.    Legal Insufficiency of the Evidence

Petitioner argues that his due process right to have his guilt established by proof satisfying the beyond-a-reasonable doubt standard was violated because the prosecution did not produce legally sufficient evidence that he was the perpetrator of the robbery. In particular, Petitioner's focuses on the inability of Koehler and her daughter to identify Petitioner; the fact that during trial these witnesses did not identify the knit hat bearing

-14-

Petitioner's DNA as an article of clothing worn by the robber; and the discrepancy between Koehler's estimation of Petitioner's height and his actual height. The Appellate Division briefly discussed this claim and rejected it on the merits. People v. Gibson, 74 A.D.3d at 1702-03.

On federal habeas review of an insufficient evidence claim previously adjudicated by a state court, the applicable, clearly established Supreme Court law for purposes of AEDPA review is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). McDaniel v. Brown, __ U.S. __, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010) (per curiam). The federal court may not grant habeas relief unless the state court applied the Jackson standard in an "objectively unreasonable" manner. Id. Jackson's test for legal sufficiency asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (citation omitted, emphasis original). If the record supports conflicting inferences, the reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." McDaniel, 130 S. Ct. at 673 (quoting Jackson, 443 U.S. at 326)). Jackson sets "a high standard[,]" and "[i]t is not enough that [a reviewing court]

might have reached a different result . . . or . . . may have reasonable doubt." <u>Jones v. Wood</u>, 207 F.3d 557, 563 (9ᵗʰ Cir. 2000).

Petitioner here challenges only the sufficiency of the prosecution's proof regarding identity and does not contend that the evidence was otherwise insufficient to establish the elements of the robbery charge.[2] The Appellate Division, the last state court to issue a reasoned decision on Petitioner's sufficiency of the evidence of claim, determined that the evidence of identity was sufficient, and, moreover, that the verdict was not against the weight of the evidence. The only question for this Court is whether the Appellate Division reasonably determined that a rational trier of fact could have found, beyond a reasonable doubt, that Gibson robbed the Noco store. <u>See</u> <u>Cavazos v. Smith</u>, ___ U.S. ___, 132 S. Ct. 2, 7-8, 181 L.Ed.2d 311 (2011) (<u>per</u> <u>curiam</u>) (reversing circuit court's decision granting habeas petition in light of finding that it was reasonable for state court to determine that jury's verdict was rational).

The Appellate Division found that the following facts were sufficient evidence of identity:

> Clothing worn by the perpetrator was found by the police in the backyard of a residence approximately 200 yards

---

[2]
Petitioner was found guilty of robbery in the first degree (display of a firearm), which requires proof that a person "forcibly steals property and . . . , in the course of the commission of the crime or of immediate flight therefrom, . . . . displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm. . . ." N.Y. Penal Law § 160.15(4).

from the scene of the robbery, including the knitted cap with the DNA matching that of defendant. In addition, defendant's girlfriend was observed near the scene of the robbery shortly after the crime was committed, and she and defendant were seen walking together approximately a half mile from the crime scene less than an hour later. Finally, defendant matched the general description of the perpetrator, whose face was covered by clothing during the robbery.

Gibson, 77 A.D.3d at 1702-03. The Appellate Division concluded that viewing this evidence in the light most favorable to the prosecution, "there is a valid line of reasoning and permissible inferences to support the jury's finding that defendant committed the robbery. . . ." Id. (internal citation omitted).

Identity is always an essential element of a criminal prosecution, but "there is no rule of law that requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence." United States v. Kwong, 14 F.3d 189, 193 (2d Cir. 1994) (citations omitted). See also Holland v. United States, 348 U.S. 121, 140 (1954) (circumstantial evidence that convinces jury beyond reasonable doubt sufficient to sustain criminal conviction). From the facts summarized above, the jury could reasonably have inferred that (1) the tan Celtics baseball hat, and sweatshirt and sweatpants found at 80 Colton Street were items of clothing worn by the robber, as identified by Kohler and as depicted in the videotape; and(2) those items and the knit hat containing Petitioner's DNA were all worn by the same person since they were found in close proximity at 80 Colton Street. The jury

-17-

was entitled to find that the sweatshirt and sweatpants they appeared to have been discarded hastily, as if by someone fleeing a crime scene and not by a resident discarding trash; and the jury could reject Petitioner's girlfriend's testimony that she was trying to get into the Noco to buy some food. It was not irrational for the jury to have concluded that, given her suspicious behavior (standing in the middle of the Noco parking lot near the gas pumps and stared fixedly at Officer Caber when he responded to the 911 call), she was acting as a lookout for Petitioner. Finally, the jury was entitled to reject Petitioner's girlfriend's claim, when they were stopped by Officer Caber very near to the Noco store, that they were on their way to visit Petitioner's grandfather at 7:00 a.m. in the morning on a weekend. Although mere presence at the scene of the crime, at the time the crime occurred, is insufficient to establish commission of the crime, evidence of opportunity and presence at the crime scene may contribute to a finding of guilt.

Petitioner points that although Koehler identified a number of articles of clothing worn by the robber, she did not describe the robber as wearing the knit hat or identify the knit hat at trial. He also notes that the knit hat, the centerpiece of the prosecution's case, is not visible in the surveillance videotape, which was not, as Detective Cardi stated, of the "greatest quality." Petitioner also emphasizes discrepancies in witnesses'

descriptions the robber's age and height. For instance, the suspect was described to Officer Caber by a witness who saw a black male running north on Victory Street as being around eighteen-years-old, but Petitioner was nearly thirty-two at the time of the crime. Koehler described the robber as 5'3" or 5'4", while Petitioner's height is given as 5'7" in the pre-sentence report.

Petitioner is essentially asking this Court to reweigh the evidence and to set aside the rational inferences that could be drawn from the circumstantial evidence presented at his trial. However, a habeas court cannot reevaluate the evidence or draw new inferences. In reviewing the sufficiency of the proof, the Appellate Division was required to reject any conflicting evidence that was inconsistent with the jury's verdict. <u>Jackson</u>, 443 U.S. at 319 (reviewing court must consider evidence "in the light most favorable to the prosecution"). This Court must defer to the Appellate Division's determination, which was not objectively unreasonable.

### C.    Prosecutorial Misconduct

The Appellate Division summarily rejected Gibson's claim of prosecutorial misconduct as without merit. An unexplained adjudication of a petitioner's federal claim is entitled to deference under AEDPA. Thus, to obtain habeas relief, Gibson must demonstrate that the Appellate Division unreasonably applied

clearly established Supreme Court precedent regarding prosecutorial misconduct.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). For habeas relief to be granted based upon prosecutorial misconduct, the alleged prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). At the same time, criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone in an otherwise fair proceeding. United States v. Young, 470 U.S. 1, 105 S. Ct. 1038, 1044, 84 L. Ed.2d 1 (1985) (context in which remarks were made must be examined to determine the probable effect on the jury's ability to judge the evidence fairly).

First, Petitioner asserts that it was improper for the prosecutor, when introducing the surveillance video, to liken it, and the trial itself, to something one might see in an episode of a crime drama on television:

> But I think this trial could have served as back to back episodes of CSI or Law and Order. Picture the opening scene, Stacey Kohler in the Noco station, the store appears empty because young Courtney is small. She's short and you can't see her, she's out of sight. You cut back to the defendant outside the Noco and looking in. He

can't see young Courtney. The store appears empty, might
as well go for it. The camera pulls back, the defendant
is pulling his knit hat down over his face as he
approaches the door. The camera cuts back to Stacey
getting ready to have a cigarette.

T.721-22. The videotape was then played for the jury. After

summation, trial counsel objected that this comment impermissibly

blurred the boundary between fantasy and the actual trial evidence,

and improperly suggested that Gibson was wearing the hat, when

there is no knit hat visible on the videotape, see T.746. Defense

counsel asked for a curative instruction to the effect that "there

should be no conclusion drawn by the jury that the video depicts a

knit hat." T.747. The prosecutor responded, "[A]t no time did I say

you can see from the video the knit hat. I didn't say that because

I know that is not on the video . . . ." T.747. The trial court

allowed the parties to make their arguments and upon listening to

a read-back of the challenged remarks, agreed with the prosecutor

that it was "fair comment based upon the evidence." T.749. In other

words, the prosecutor was making an argument that "this is what

[his] proof showed." T.750.

"Both prosecution and defense are entitled to broad latitude

in the inferences they may suggest to the jury during closing

arguments." United States v. Suarez, 588 F.2d 352, 354 (2d Cir.

1978) (citation omitted). The law, however, is "clear that it is

improper for a prosecutor to mischaracterize the evidence or refer

in summation to facts not in evidence." United States v. Rosa, 17

F.3d 1531, 1548-49 (2d Cir. 1994). See also 3 Charles Alan Wright,
Nancy J. King & Susan R. Klein, Federal Practice and Procedure
§ 555 (3d ed. 2004) ("It is misconduct for a prosecutor to make an
assertion to the jury of a fact, either by way of argument or by an
assumption in a question, unless there is evidence of that fact.").
(quoted in United States v. Gentles, 619 F.3d 75, 81 (1st Cir.
2010)). Although the prosecutor's comment fell close to the line,
the Court cannot say that the trial judge abused his discretion in
finding that the comment was part of the prosecutor's argument
about what his evidence showed rather than an assertion that the
videotape depicted the knit hat.

Petitioner's next argues that the prosecutor improperly
asserted that the clothing Koehler had identified as belonging to
the robber contained Petitioner's DNA. The prosecutor said, in
relevant part, "Jeffrey Gibson has been identified as the robber.
He identifies himself through his own DNA which is on the clothing
that's on the video that was truthfully and accurately identified
by the victim, Stacey Koehler." T.743 (emphasis supplied). The
Court agrees with Petitioner that in this remark, the prosecutor
blurred the distinction between the knit hat and the other items of
clothing.  However, viewing the record as a whole, it appear to
have been made in bad faith given that earlier in his summation,
the prosecutor correctly noted that there was "nothing
interpretable [as far as DNA] from the clothing[.]" T.739. The

prosecutor argued that the "connection for the clothing is on the video and the connection of the clothing and the hats [is] because of where they were found and the manner in which they were found." Id. The objected-to comment was imprecise and the prosecutor should have been more careful. Nonetheless, the Court cannot find that this went beyond "ordinary trial error of a prosecutor" and amounted to "that sort of egregious misconduct" constituting "a denial of constitutional due process." Donnelly, 416 U.S. at 647-48 (citations omitted).

### D.   Ineffective Assistance of Trial Counsel

Petitioner claims, as he did on direct appeal, that trial counsel failed to provide the level of representation guaranteed by the Sixth Amendment based upon his (1) failure to make a motion to dismiss adequate to preserve a legal sufficiency challenge for appellate review; (2) failure to raise the right to counsel issue during the suppression hearing; (3) failure to request a specific jury charge on identity; and (4) failure to request an expanded circumstantial evidence charge. The Appellate Division summarily rejected this claim on the merits, and this ruling is entitled to deference on federal habeas review AEDPA. Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) ("Although the state court did not specifically dismiss Murden's assertion regarding the failure [by trial counsel] to investigate the 1972 suicide attempt, an

unexplained ruling on the merits is also entitled to AEDPA deference.") (citations omitted).

Strickland v. Washington, 466 U.S. 668 74 (1984), is the relevant "clearly established" Supreme Court precedent for evaluating his claims of error. Murden, 497 F.3d at 198. The Strickland standard requires a petitioner to show that counsel's representation "fell below an objective standard of reasonableness" determined according to "prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694. A petitioner's failure to adequately demonstrate one prong of the Strickland standard is fatal to his claim of ineffective assistance. See id. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).

The Court addresses Petitioner claims of error by trial counsel in turn. First, trial counsel's failure to make a motion

to dismiss specifically mentioning the insufficiency of the evidence on the element of identity did not result in prejudice Petitioner because the Appellate Division considered the legal insufficiency claim on the merits. See Waters v. McGuiness, No. 99-CV-0615, 2003 WL 21508318, at *3 (E.D.N.Y. June 16, 2003) ("The Appellate Division reached the merits of the claim on direct appeal and held that the verdict was legally sufficient to establish guilt beyond a reasonable doubt and that it was not against the weight of the evidence. Even if counsel was ineffective for failing to preserve the claim, therefore, petitioner was not prejudiced because the Appellate Division entertained the claim and rejected it on the merits."), aff'd, 99 Fed. Appx. 318 (2d Cir. 2004); accord Gaskin v. Graham, 08-CV-1124, 2009 WL 5214498, at *25 (E.D.N.Y. Dec. 30, 2009).

Likewise, trial counsel's failure to raise the right to counsel issue during the suppression hearing did not prejudice Petitioner because, as a matter of state law, such claims need not be preserved if the factual record is adequate to permit appellate review. People v. Kinchen, 60 N.Y.2d 772, 773-74 (1983) (citation omitted). Notably, Petitioner's appellate counsel conceded that the record was adequate to permit appellate review of the unpreserved right to counsel issue. In addition, the state courts' lengthy analyses of the issue demonstrated the adequacy of the record for such appellate review. In light of Petitioner's failure to

demonstrate prejudice, there is no need to consider whether the failure to raise the right to counsel issue at the suppression hearing amounted to deficient performance.

Counsel's failure to request a charge on identity and circumstantial evidence does not satisfy the "deficient performance" prong of <u>Strickland</u>. "The New York Court of Appeals has held that, although expanded identification instructions are preferable, especially when there is a dose question of identity, the failure to give such an instruction does not constitute reversible error." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 99-100 (2d Cir. 2001) (citations omitted). The decision whether to give an expanded identification charge lies with the trial judge. <u>Id.</u> (citation omitted). When the judge has given a "general instruction on weighing witnesses' credibility and . . . states that identification must be proven beyond a reasonable doubt," the judge has made an "accurate statement of the law." <u>Id.</u> (quotation omitted). Here, the trial court instructed the jury as to how assess the credibility of the witnesses and repeatedly instructed the jury that in order to convict Petitioner of robbery, it had to conclude beyond a reasonable doubt Petitioner was the perpetrator of each element of the charged offense. Thus, the instruction actually given sufficed as "an accurate statement of the law." "Because, under the circumstances, the jury instructions were not improper, the failure of Petitioner's trial counsel to object or

request an additional instruction was not objectively unreasonable." Aparicio, 269 F.3d at 100. As Petitioner cannot demonstrate defective performance, the Court need not consider the prejudice aspect of the Strickland test.

Similarly, trial counsel's failure to request an additional instruction on circumstantial evidence did not amount to constitutional ineffective performance. The New York Court of Appeals has held that it is not necessary that a circumstantial evidence charge use the words "moral certainty" but has emphasized that "the jury should be instructed in sum and substance that "it must appear that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence." People v. Ford, 66 N.Y.2d 428, 441 (1985) (quotation and quotation marks omitted). Here, the trial court properly instructed the jury with regard to circumstantial evidence in relevant part as follows:

> Before you may draw an inference of guilt, however, that inference must be the only one that can fairly and reasonably be drawn from the facts. It must be consistent with the proven facts and it must flow naturally, reasonably and logically from them.
>
> Again, it must appear that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence.

T.765-66. The instruction given by the trial court thus comported with New York state law, and it was unnecessary for the trial court

to have stated that "the facts proved must exclude 'to a moral certainty' every reasonable hypothesis of innocence,"' Ford, 66 N.Y.2d at 442 (quotation omitted). As the charge was correct as a matter of law, it was not objectively unreasonable for trial counsel not to object or request additional language.

Considering the claimed errors in the aggregate, see, e.g., Lindstandt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001), the Court finds that none meet the requirements set out in Strickland—either individually or in the aggregate. Given that Gibson is unable to fulfill the Strickland test, it necessarily follows that the Appellate Division did not unreasonably apply Strickland in rejecting his ineffective assistance claim.

## IV. Conclusion

For the reasons stated above, Jeffrey D. Gibson's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Gibson has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York,

within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     October 23, 2012
           Rochester, New York.